NEW PAR, a Delaware Partnership,
d/b/a Verizon Wireless,
Plaintiff,

v.

CITY OF SAGINAW, Defendant.

No. 00–10240–BC.

United States District Court,
E.D. Michigan,
Northern Division.

July 10, 2001.

the Telecommunications Act of 1996(Act) seeking mandamus and injunctive relief from a decision of the Board of Zoning Appeals for the City of Saginaw denying a variance which would have allowed the placement of a cellular telephone tower on property which the City's zoning ordinance otherwise would not have permitted. The plaintiff contends that the denial violates the Act, specifically § 704 thereof, codified at 47 U.S.C. § 332(c)(7), because the Board's decision is not in writing and it is not supported by substantial evidence. The City contends that its decision is in conformity with the Act and all applicable zoning laws. This matter is before the Court on cross motions for summary judgment. Because the Court finds that the City's decision to deny the request for a zoning variance does not comport with the requirements of § 704 that a decision "to deny a request to ... construct ... personal wireless service facilities shall be ... supported by substantial evidence contained in a written record," 47 U.S.C. § 332(c)(7)(B)(iii), the Court will grant the plaintiff's motion for summary judgment.

Zora E. Johnson, David A. Antonelli, Dykema Gossett, Bloomfield Hills, MI, for Plaintiff.

Nancy L. Bondar, Chasnis, Dogger, Thomas H. Fancher, Saginaw, MI, for Defendant.

*OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

LAWSON, District Judge.

The plaintiff, a provider of cellular telephone service, has filed this action under

## I.

As noted above, New Par provides cellular telephone service for the City of Saginaw and has a license issued by the Federal Communications Commission (FCC). To provide cellular telephone service to individual communities, New Par must erect a series of strategically-located antennae to send and transmit the cellular telephone signals. New Par currently has five antennae in the City of Saginaw.

New Par holds an option to purchase the property at 2115 Durand Street in Saginaw, Michigan. The lot is approximately 3,409 square feet. This property was originally zoned "Residence A." In the 1970s, the City of Saginaw performed a rezoning

and the Durand Street property was rezoned as "M–1" (light industrial). Permitted uses on M–1 property include "[p]ublic and private utility buildings, telephone exchange buildings, electric transformer stations and substations, gas regulator stations, municipal pumping stations, lines, easements, installations and facilities, including storage yards." Saginaw Zoning Code § 1802. Under the zoning ordinance, M–1 properties require a minimum width of 100 feet and a minimum square footage of 20,000 square feet for use.

On March 9, 2000, New Par applied for a building permit to demolish the existing residence on the Durand Street property and erect a cellular tower, utility shed, and barbed wire fence. Because the property did not meet the minimum square footage requirement, the City of Saginaw did not grant the building permit. As a result, New Par filed an appeal with the Zoning Board of Appeals on April 20, 2000 seeking a variance from the minimum square footage and frontage requirement.

Under the applicable zoning ordinances, an applicant for a variance must show that the proposed variation involves exceptional circumstances not found in other areas of the same zoning district, will be in harmony with the general purposes and intent of this Ordinance, will not impair the public health, safety, comfort, or welfare of the inhabitants of the City, and meets the following general standards:

a.  The proposed use will be of such location, site, and character that it will be in harmony with the appropriate and orderly development of the surrounding neighborhood.

b.  The proposed use will be of a nature that will make vehicular and pedestrian traffic no more hazardous than is normal for the district involved, taking into consideration vehicular turning movements in relation to routes of traffic flow, proximity and relationship to intersections, adequacy of sight distances, location and access of off-street parking, and provisions for pedestrian traffic, with particular attention to minimizing child-vehicle contacts in residential districts.

c.  The location, size, intensity, site layout, and periods of operation of any such proposed use will be designed to eliminate possible nuisance emanating therefrom which might be noxious to the occupants of any other nearby permitted uses, whether by reason of dust, noise, fumes, vibration, smoke, or lights.

d.  The location and height of buildings or structures and the location, nature, and height of walls and fences will be such that the proposed use will not interfere with or discourage the appropriate development and use of adjacent land and buildings or unreasonably affect their value.

Saginaw Zoning Code § 2714.

The Zoning Board of Appeals considered New Par's application on May 3, 2000. Presentations were made by New Par's attorney and the project manager for the proposed tower installation. The attorney advised the Board that written materials had been submitted describing the project as a 150–foot monopole structure without any supporting guy wires. The height of the tower did not call for marker lights, and the tower itself did not create any dust, smoke, noise, vibrations, or fumes. The maintenance shed did not require the use of city services such as water, sewer, garbage pick-up or natural gas, and the traffic volume consisted of visits by maintenance personnel approximately four times per month. The shed would have a single access door illuminated by a safety

light and it would be surrounded by a six-foot chain-link fence.

On the question of hardship, the project manager stated that New Par's engineers could find no reasonable alternative sites which would allow it to fill the "gap" in its coverage area. This "gap" was created by increased demand for cellular service and the capacity limitations of five other existing towers located within the City of Saginaw. Engineering studies had described a "search ring" within which the new tower must be located. Moving the proposed location farther south within the "search ring" would require a location in a residential district. Further, the small lot size of the proposed site on Durand Street would make the lot unuseable for any purpose permitted in the City's M–1 zoning district. Although acquiring an adjoining lot (which was not for sale) would satisfy the frontage requirement, New Par would have to buy the entire block to meet the square footage requirement of the ordinance.

Some Board members, noting that some of the neighbors were opposed to the variance, expressed concern about the unsightliness of a 150-foot pole located next to residences (which were built before the area was rezoned for light manufacturing). The engineer acknowledged that the tower itself could not be hidden, but landscaping could obscure the structure at ground level. One neighbor, who said he represented the view of others, spoke at the meeting and expressed concern that the tower would be in an area that was essentially residential, despite the present zoning, and that the property values might suffer. He also expressed concern about electromagnetic emissions. The matter was ultimately tabled for 30 days to allow New Par and the City of Saginaw to address the concerns raised by the board members, including a landscaping proposal addressing aesthetics.

The request for a variance was before the Board again at the June 7, 2000 meeting. There, New Par presented a plan for landscaping. New Par also stated that the owners of a possible alternate site were not willing to discuss a sale. New Par reiterated the fact that the property could not be used by anyone for any purpose without a variance, even though the proposed use was consistent with existing zoning. New Par's lawyer reiterated that the hardship consisted of its inability to meet the needs of its customers without the new tower, but the engineer also described new FCC requirements for caller identification that required new tower installations. One Board member asked what would happen to the tower if the company became insolvent. The attorney responded that New Par's financial condition rendered that development unlikely, but offered to post a bond covering the cost of tower removal if necessary. Three neighbors submitted writings simply stating that they opposed the variance, and one neighbor, who spoke at the May hearing, restated his opposition and voiced his concern about emissions again.

At the conclusion of the presentation, the Board members discussed their concerns. One Board member expressed the view that "the lot size being [sic] fits like a sore thumb in the residential.[sic] ... And it might have something to do with home value, ya know. That was one reason that I thought in my mind, they could put a higher tower in a properly zoned area." Minutes of June 7, 2000 Board of Zoning Appeals Meeting at 9. The vote was called, and the Board denied the application for a variance with two members voting in favor, three members voting against, and one member abstaining. A vote of four member in favor of the variance was required to approve the variance.

The plaintiff then filed suit on June 28, 2000 claiming violations of the Act, 47 U.S.C. § 332(c)(7), seeking a Court order requiring the City of Saginaw to grant the variance. New Par has also alleged violations of state law for which it seeks damages (including lost profits) and costs, interest, and attorney fees. The parties have filed cross motions for summary judgment. It is New Par's position that the variance was arbitrarily denied in violation of the Act. The City of Saginaw claims the decision by the Board of Zoning Appeals was a valid exercise of discretion and because Saginaw did not discriminate against New Par, it did not violate the Act.

## II.

■ A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. A party opposing a motion for summary judgment must show by affidavits, depositions, or other factual material that there is "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler,* 215 F.3d 594, 599 (6th Cir.2000). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

A party may support a motion for summary judgment by demonstrating that an opposite party, after sufficient opportunity for discovery, is unable to meet her burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). The non-moving party may not merely rely upon the pleadings to oppose a motion for summary judgment but must come forward with affirmative evidence in the form of materials described in Rule 56(c) to establish a genuine issue on a material fact. *Id.* at 324, 106 S.Ct. 2548. Even in complex cases, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

## III.

Congress stated that the purpose of the Telecommunications Act is "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56. *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 857, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The Act creates a cause of action for "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph." 47 U.S.C. § 332(c)(7)(B)(v). The cause of action must be commenced within 30 days of the adverse decision, *id.,* which occurred in this case: the Board's decision was made on June 7, 2000 and the complaint was filed on June 28, 2000.

Under a prior draft of a Senate Bill, Congress proposed the creation of a national commission to develop uniform policies for the siting of wireless communications towers. *See* 141 Cong. Rec. H9954 (daily ed. Oct. 12, 1995)(Reading S.652, Telecommunications Competition and Deregulation Act of 1995, at § 108 Facilities Siting). *Cf. PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp 2d 1052, 1058 (N.D.Ill.1998). In its final version, however, the Act recognizes the preservation of local zoning authority, noting "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). The Act does, however, limit regulation by any state or local government which (1) unreasonably discriminates among providers of functionally equivalent services or (2) prohibits or has the effect or prohibiting the provision of personal wireless services. 47 U.S.C. § 332(c)(7)(B)(i). The Act also provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities *shall be in writing and supported by substantial evidence contained in a written record.*" 47 U.S.C. § 332(c)(7)(B)(iii)(emphasis added). New Par contends that the City of Saginaw violated both the requirement that the decision be in writing and that it be supported by substantial evidence in the written record.

## A.

▮ The Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing...." 47 U.S.C. § 332(c)(7)(B)(iii).

Courts are split on what satisfies the criteria for a "decision ... in writing."

One view posits that a "decision ... in writing" should include specific statements to allow for adequate judicial review of the decision. *Omnipoint Communications, Inc. v. Penn Forest Township.*, 42 F.Supp.2d 493, 499 (M.D.Pa.1999); *Virginia Metronet, Inc. v. Board of Supervisors of James City County*, 984 F.Supp. 966, 972–73 (E.D.Va.1998).

One court in the Central District of Illinois concluded that the term "in writing" "*plainly* require[s] ... decisions ... in written form, stating the reasons for the decision, and providing written evidence or a written record of the proceedings that led to the government entity's decision." *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732, 743 (C.D.Ill.1997)(emphasis added). *See Omnipoint Communications, Inc. v. Planning & Zoning Comm'n of the Town of Wallingford*, 83 F.Supp.2d 306, 309 (D.Conn. 2000). In *Illinois RSA*, the Court held that the following written denial failed to satisfy the "decision ... in writing" requirement:

On June 11, 1996, the Peoria County Board DENIED your request for a Special Use for a utility communication tower in the R1 Zoning District.

You have the right to appeal this decision. You must file your appeal with the Peoria Circuit Clerk's Office. Please contact your attorney if you have questions about this letter.

*Id.* The Court reached this conclusion by reasoning that "[d]ecisionmak[ers] must make written findings and conclusions so that reviewing bodies may efficiently judge those findings and conclusions against the evidence and the record." *Id.* For this same reason, a Court has held that a transcript of the zoning board hearing was

insufficient to comply with the "decision ... in writing" requirement. *Western PCS II Corp. v. Extraterritorial Zoning Auth. of the City and County of Santa Fe*, 957 F.Supp. 1230, 1236 (D.N.M.1997).

However, another Central District of Illinois Court disagreed with the *Illinois RSA* court's "plain" reading of the statute. In *Iowa Wireless Servs., L.P. v. City of Moline, Illinois*, 29 F.Supp.2d 915, 920 (C.D.Ill.1998), the Court held that the written denial in that case, though less extensive than judicial or administrative opinions, was "sufficient under the plain meaning of the [Act]." *Id.* The written denial stated:

> I move that the Council enter a formal finding that the project would produce health concerns for the residents and others nearby and produce inappropriate radio emissions; that the council had strong safety concerns of the structural integrity of the proposed tower as designed or proposed; that the council believed that neighboring property or properties would be negatively impacted from a financial and aesthetic standpoint, resulting in further land value depreciation; and for all other reasons as set forth in the written record and materials contained throughout the zoning/permit process and the Council further clarify that written record upon which it acted is as set forth in the minutes to the 9/2/98 meeting and as attached hereto as Exhibit Z for purposes of clarifying both written and base upon which the Council acted in disapproving Council Bill 98–237.

*Id.* at 919.

Conversely, a Northern District of Illinois Court has held that the purpose of the "writing" requirement is simply to notify the applicant of the decision and report of the decision in the hearing minutes fulfills that requirement. *PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp.2d 1052, 1061–62 (N.D.Ill.1998). In that case, the Court analyzed the decisions on this issue and detected two trends: the rigorous-review trend and the substantial deference trend. The rigorous-review trend (represented by a majority of district court decisions, the *PrimeCo* Court notes) interprets "writing" to require factual findings and reasons for denial. *Id.* at 1059–60. The substantial deference trend (represented by a Fourth Circuit decision and a small number of district court decisions) interprets "writing". narrowly to require no more than "DENIED" on a written statement. *Id.* at 1060–61. The *PrimeCo* Court noted that the reasoning used by rigorous-review courts is backward: "they argue that substantial evidence review would be impossible—or at least exceedingly difficult—absent an opinion-style writing denying special use applications." *Id.* at 1059.

The minutes described the application and summarized the discussion at the hearing.

> ITEM KK: A MOTION TO ACCEPT ORDINANCE 97–47 AMENDING THE ZONING ORDINANCE OF THE VILLAGE BY GRANTING A SPECIAL USE TO OCS PRIMECO[,] A CORPORATION[,] TO ALLOW THE CONSTRUCTION OF A CELLULAR TELEPHONE TOWER & EQUIPMENT CABINET ON THE PROPERTY COMMONLY DESIGNATED AS 855 RAND ROAD.

> .    .    .    .    .

> TRUSTEE HUNTER SAID HE WANTED TO REMOVE ITEM KK FOR THE FOLLOWING REASONS: BECAUSE OF THE LACK OF COMMUNICATION WITH THE CURRENT BOARD AND PRIMECO TO INVESTIGATE "A MUTUALLY VISI-

UAL [sic] IMPACTING SITE;" A LETTER RECEIVED 10/6/97 BY PRIMECO STATED THAT "PRIMECO IS COMMITED [sic] TO SECURING SITES THAT HAVE MINIMUAL [sic] VISUAL IMPACT ON AN AREA, AND IS EAGER TO PROVIDE SERVICES TO THE RESIDENTS AND BUSINESS [sic] IN AND AROUND FOX LAKE"; IN THE MINUTES OF THE HEARING OF THE SPECIAL USE PERMIT FOR 855 RAND ROAD PRIMECO'S LEGAL CONSOLE [sic] STATES THAT "THE BENEFIT TO THE COMMUNITY WOULD · BE THAT TOURIST'S [sic] COULD USE THEIR PHONES IN THE VILLAGE".

TRUSTEE HUNTER MADE A MOTION TO DENY THE PERMIT AT 855 S. RAND ROAD, SECOND BY TRUSTEE ERDMAN.

AYES: ALL

NAYS: NONE

MOTION CARRIED.

*Id.* at 1056–57.

Similarly, a court in this District has held that written minutes explaining the board's reasons meet the requirement of a "decision . . . in writing." *Laurence Wolf Capital Mgmt. Trust v. City of Ferndale,* 128 F.Supp.2d 441, 447 (E.D.Mich.2000). In that case, the board adopted five reasons in its minutes:

1. No evidence was brought forward that the property could not reasonably be used under the current zoning;

2. [N]o unique circumstances existed that would allow only this use;

3. [T]he monopole antenna that would be erected on Plaintiff's property would alter the neighborhood's character;

4. Plaintiff's problem was self-created; and

5. [T]he monopole's height would have required a variance as to height.

*See id.* at 444. The Court mentioned, in *dictum,* that a letter stating that the request was denied would also have met the "writing" requirement. *Id.* at 447.

Most Courts seem to blend the analysis for what is required under the "in writing" and "substantial evidence" requirements. However, the Court of Appeals for the Fourth Circuit explicitly, and appropriately, examined the requirements separately, concluding that "in writing" meant simply that the decision was memorialized on paper. *AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach,* 155 F.3d 423, 429 (4th Cir. 1998). The Court held that summarizing the decision in the condensed minutes (describing the application, listing the names of those who testified, and recording the votes of each councilperson) and sending a letter which described the application and was stamped "DENIED" was sufficient. *Id.* The Court reasoned that only way a contrary finding was possible was by "importing additional language into the statute." *Id.*

Congress has used more explicit language in other sections of the Act to specify the contents of a "writing." *Virginia Beach,* 155 F.3d at 430. For instance, state commissions are required to make "written findings as to any deficiencies" of interconnection agreements. 47 U.S.C. § 252(e)(1). Likewise, on applications by Bell operating companies, Congress has required that the FCC shall in its "written determination approving or denying the authorization . . . . state the basis for its approval or denial of the application." 47 U.S.C. § 271(d)(3).

The Supreme Court has held that courts should refrain from reading a phrase into the statute when Congress has left it out.

*Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). In *Keene Corp.,* the Court stated that "[w]here Congress includes particular language in one section of a statute but omits it in another, ... it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* (internal quotes and citations omitted). Additionally, "[a]ny indulgence in construction should be in favor of the States, because Congress can speak with drastic clarity whenever it chooses." *Bethlehem Steel Co. v. New York State Labor Relations Bd.,* 330 U.S. 767, 780, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947). This Court agrees that for the purpose of the Telecommunications Act on 1996, "decision ... in writing" should not be inflated to require a "statement of ... findings and conclusions, and the reasons or basis therefor." *Virginia Beach,* 155 F.3d at 429.

■ In the instant case, the zoning board of appeals did not issue written reasons for its decision. It did, however, issue an order summarizing the request, the decision, and the votes of individual board members. The order does state that the denial was "[b]ased on the facts presented and the Board's determination, *both of which will appear in the minutes of this meeting.*" The Court finds that the board's order, by itself, meets the "writing" requirement of the Act.

### B.

As with the "decision ... in writing" requirement, courts are split on the nature of judicial review under the "substantial evidence" standard as commanded by the Act. The term itself is not separately defined in the Act, and the legislative history suggests merely that the term is meant to evoke "the traditional standard used for judicial review of agency decisions." H.R.

Conf. Rep. No. 104–458, at 208. *See PrimeCo,* 26 F.Supp.2d at 1059.

In *PrimeCo,* the Court observed that the division of authority has cleaved into a "rigorous-review trend" and a "substantial deference trend." *PrimeCo,* 26 F.Supp.2d at 1059–61. These trends reflect, perhaps, the imperfect analogy of applying the body of law which has developed in the area of judicial review of agency decisions to the Act's direction that courts review decisions of state bodies that are essentially legislative. The Fourth Circuit has recognized this distinction when it held that "substantial evidence" can consist not only of legislative facts—that is, facts relating to the physical character of the land and physical structure encompassing the installation—but also the concerns and opinions, however supported (or unsupported) of constituents. *Virginia Beach,* 155 F.3d at 430 ("It is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all other legislative matters. These views, if widely shared, will often trump those of bureaucrats or experts in the minds of reasonable legislators."). *See also Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 495–96 (2d Cir.1999).

However, the substantial deference afforded zoning legislation challenged, for example, under the Due Process Clause employing a rational basis analysis, *see, e.g., Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467–68 (7th Cir. 1988), *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1223 (6th Cir.1992), is not commanded by Congress' choice of the "substantial evidence" language used in the Act. Rather, the "traditional standard" of "substantial evidence" has been defined by the Sixth Circuit as

more than a scintilla of evidence but less than a preponderance and is such rele-

vant evidence as a reasonable mind might accept as adequate to support a conclusion. The scope of our review is limited to an examination of the record only.

*Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir.1989)(internal citations omitted). The Court examines both the evidence in favor of the decision and the evidence opposed to the decision. *Iowa Wireless Servs. v. City of Moline, Illinois*, 29 F.Supp.2d 915, 921 (C.D.Ill.1998)(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). A Court may not base its decision on a single piece of evidence and disregard other pertinent evidence when evaluating whether substantial evidence in the record exists. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir.1978). Thus, where an agency's decision is supported by substantial evidence, it must be upheld even if the record might support a contrary conclusion. *Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir.1989). The substantial evidence standard "presupposes that there is a zone of choice within which decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir.1986) (en banc) (internal quotes and citations omitted). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984). If the Court reviews the entire record, including evidence that distracts from the weight of evidence used to support its decision, and finds that substantial evidence does not support the agency's decision, then the agency's decision must be overturned. *Telespectrum, Inc. v. Public Serv. Comm'n of Kentucky*, 227 F.3d 414, 423–24 (6th Cir.2000).

▇ The use of the "substantial evidence" standard in the Act does not necessarily cause a shift in the burden of proof. Generally, the burden of proof on judicial review "rests with the party seeking to overturn the decision of the agency." *Barwacz v. Michigan Dep't of Educ.*, 674 F.Supp. 1296, 1302 (W.D.Mich.1987); *Century Cellunet of S. Michigan, Inc. v. City of Ferrysburg*, 993 F.Supp. 1072, 1077 (W.D.Mich.1997). The First Circuit has held that the general rule applies under the Act. *Southwestern Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 63 (1st Cir.2001). The *Todd* Court, looking at the Act, saw nothing to "support placing a burden upon the Board." *Id.*[1] This Court agrees.

Nor does the "substantial evidence" standard itself disqualify any species of

---

1. A Massachusetts federal district court relied on an unpublished Iowa state district court decision in holding that the burden of proof is on the government agency. *Sprint Spectrum L.P. v. Town of Easton*, 982 F.Supp. 47, 49 (D.Mass.1997); *see also Omnipoint Communications Enters., Inc. v. Town of Amherst, New Hampshire*, 74 F.Supp.2d 109, 122–23 (D.N.H.1998). The *Easton* Court explained that the burden is on the government "rather than burdening the applicant with producing substantial evidence supporting its approval." *Easton*, 982 F.Supp. at 49 (citing *United States Cellular Corp. v. Board of Adjustment of City of Des Moines, Polk County District Court*, LACL No. CL 00070195 (Iowa Dist. Ct. for Polk County Jan. 2, 1997)). Further, the *Easton* Court reasoned, "because the TCA 'effectively preempts state law in several respects, including the burden of proof, ... it is the Board's burden to produce substantial evidence supporting its denial of plaintiff's application.' " *Id.* at 52 (quoting *United States Cellular Corp.*, at 5). This Court is not persuaded by this reasoning, nor can it find any justification for a burden-shifting requirement in the plain language of the Act, especially in light of the provision stating that "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A).

evidence traditionally considered by a decisional body, such as a Board of Zoning Appeals. Consequently, input from constituents, especially neighboring landowners, is appropriate. However, the views of the neighbors must themselves be examined to determine their underlying factual substance in order to decide what, if anything, they add to the calculus.

In this case, New Par was required to make a showing required by the ordinance sufficient to establish its right to a variance. A "variance" is permission to use property in a way not permitted by a zoning ordinance. *Frericks v. Highland Township*, 228 Mich.App. 575, 582, 579 N.W.2d 441, 446 (1998). The burden of proof falls to the landowner seeking the variance. *Id.* Although the written record shows that the request was denied, the Board articulated no reasons for its action. Even this failure, although hardly conducive to the Court's review obligation under the Act, is not fatal to the decision. Rather, the Court will presume that the Board denied New Par's request for a variance because it found that New Par failed to carry its burden under the ordinance. Accordingly, the Court will examine the written record to determine whether it contains substantial evidence to support this determination.

### 1.

Section 2712 of the Saginaw Zoning Code authorizes a variance where "the strict application of the provisions of this Ordinance ... would result in ... practical difficulties ... or ... undue hardship" to the property owner. Saginaw Zoning Code § 2712. Hardships must be "due to the unique circumstances of the property." *Johnson v. Township of Robinson*, 420 Mich. 115, 126, 359 N.W.2d 526, 531 (1984)(citing *Puritan–Greenfield Ass'n v. Leo*, 7 Mich.App. 659, 670–71, 153 N.W.2d 162 (1967)). In addition, hardships may not be "self-created." *Id.*

New Par offered evidence at the hearings that it needed to install a new tower within its "search ring" in order to meet the needs of its customers and comply with new requirements imposed by the FCC. New Par's proposed use is consistent with existing zoning, but the unique size of the lot in the rezoned area does not permit compliance with the frontage and square foot requirements of the ordinance. New Par also offered evidence of its failed efforts to acquire other property in the M–1 district, and noted that other property within the search ring was zoned for residential use. There was no other evidence offered at the hearings to contradict New Par's showing of a hardship. A finding of no hardship would not have been supported by substantial evidence on the written record.

### 2.

Section 2714 of the Saginaw Zoning Code provides that a variance must meet four other "general standards" which are intended to insure the health, safety, comfort and welfare of the City's citizens. The first requirement is that the "location, site, and character" of the use is appropriate to the neighborhood. The only evidence in the record is that New Par's proposed use is permitted in the M–1 district. Although one Board member observed at the June 7, 2000 meeting that New Par might satisfy its needs by "put[ting] a higher tower in a properly zoned area," suggesting an alternate site, there is no evidence that the Durand Street property was not "properly zoned" or that an alternate site was available within the "search ring."

The second general standard requires that "vehicular and pedestrian traffic [shall be] no more hazardous than is normal for the district involved," accounting for traffic flow, proximity to intersections, parking

conditions and similar factors. The written record discloses that additional vehicular and pedestrian traffic generated by New Par's proposed use would be negligible. There is no contrary evidence. A finding that New Par failed in its proof on this factor is not supported by substantial evidence.

The third general standard states that the proposed use must be "designed to eliminate possible nuisance emanating therefrom which might be noxious to the occupants of any other nearby permitted uses, whether by reason of dust, noise, fumes, vibration, smoke, or lights." The evidence presented to the Board established without contradiction that the monopole tower did not generate dust, noise, fumes, vibration or smoke. The tower did not require marker lighting by the FAA. The equipment shed was to be illuminated outdoors by a single 150–watt safety light. One neighbor did express concern at both hearings about electromagnetic emissions. However, New Par's engineer stated that the antennae's radiation was well below FCC standards. Further, Congress has expressly prohibited local authorities from denying permits to construct telecommunications towers "on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC]'s regulations concerning such emissions." 47 U.S.C. § 332(c)(7)(B)(iv). The written record does not contain substantial evidence that New Par failed to satisfy the third general requirement of Saginaw's standards for judging variance applications.

The fourth general requirement states that the proposed use, including the height of structures, "not interfere with or discourage the appropriate development and use of adjacent land and buildings or unreasonably affect their value." One Board member stated that the proposed use "might have something to do with home value." One neighbor expressed concern about property values as well. However, there was no *evidence* presented at the hearing relating to the effect of the cellular tower on local property values. The written record does not support the Board's denial of New Par's request based on the considerations contained in this fourth general requirement.

### 3.

The paucity of evidence in the written record that New Par failed to establish its right to a variance to depart from the frontage and square footage requirements for uses in the M–1 zoning district, together with the absence of any rationale by the Board for its decision, compels the conclusion that Saginaw's decision "to deny [New Par's] request to ... construct ... personal wireless service facilities" was not "supported by substantial evidence contained in a written record." Saginaw, therefore, failed to comply with the requirements of 47 U.S.C. § 332(c)(7)(B)(iii).

### IV.

■ Having found that the City's decision does not comply with the requirements of the Act, this Court must determine an appropriate remedy. New Par seeks alternatively a writ of mandamus, or issuance of an injunction.

■ A writ of mandamus is appropriate when the plaintiff shows a "clear and indisputable right to the relief sought." *In re Gregory,* 181 F.3d 713, 715 (6th Cir.1999). In addition, a writ of mandamus is appropriate when no other remedy, legal or equitable, is available. *Mallard v. United States Dist. Court for S. Dist. of Iowa,* 490 U.S. 296, 309, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989). At the hearing, the plaintiff acknowledged that the decision to grant a variance is discretionary and dependent on

the evidentiary presentation at the Zoning Board of Appeals hearing. It further agrees that it has not shown a clear legal right to a variance or a clear duty on the part of the City. A writ of mandamus is therefore inappropriate.

One additional alternate remedy is to remand the matter to the Board of Zoning Appeals to conduct additional hearings. Although to do so serves the purpose of affording deference to local authorities "over decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A), it also would undercut the express direction of Congress that such matters be promptly decided. *See* 47 U.S.C. § 332(c)(7)(B)(v). Further, ample opportunity has been provided to the City and the neighboring property owners to offer evidence which contradicts New Par's presentation, and no substantial evidence has been forthcoming. Under these circumstances, a remand would serve no useful purpose and would only be the occasion for further delay.

This Court finds that issuance of a mandatory injunction is the appropriate remedy under the facts of this case, and will best serve the purposes of the Act. The matter has been discussed and considered by the local governmental body, and the issues were thoroughly briefed and argued in this court; no good reason has appeared in the record for denying New Par full relief afforded by the Act. *See Oyster Bay*, 166 F.3d at 497 (affirming issuance of injunction because "injunctive relief best serves the [Act]'s stated goal of expediting resolution of this type of action...")

### V.

In its complaint, New Par also includes counts alleging a substantive due process violation and a regulatory taking. Because the remedy the Court would order for a substantive due process violation would be injunctive relief, which the Court has ordered today, the Court need not decide the substantive due process claim as it is moot. Additionally, because the Court is ordering injunctive relief, no taking has occurred. As a result, the regulatory taking claim shall be dismissed.

■ New Par also requests attorney fees and lost profits. The Act does not expressly provide for attorney fees. Absent explicit statutory authority, attorney fees are not generally awarded to the prevailing party. *Key Tronic Corp. v. United States*, 511 U.S. 809, 819, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). Therefore, the request for attorney fees is denied. To receive lost profits, a party must offer proof of profits to be received to a reasonable degree of certainty. *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 473 (6th Cir.1996). In the instant case, proof of lost profits has not been offered. Therefore, the request for lost profits is denied.

### VI.

The Court finds that the City of Saginaw has not complied with an important requirement of the Telecommunications Act of 1996 in refusing to allow New Par a variance which would permit the construction of a cellular communications tower on land zoned for light industrial use. The Court also concludes that mandatory injunctive relief is the appropriate remedy.

Accordingly, it is **ORDERED** that the plaintiff's Motion for Summary Judgment [dkt # 13] is **GRANTED** in part. It is further **ORDERED** that the defendant's Motion for Summary Judgment [dkt # 12] is **DENIED**.

It is further **ORDERED** that Count II of the plaintiff's complaint is dismissed as moot. It is further **ORDERED** that

Counts III and IV of plaintiff's complaint are dismissed with prejudice.

It is further **ORDERED** that within fourteen (14) days of the entry of this order, the defendant's Board of Zoning Appeals grant the plaintiff's application for a variance to depart from the frontage and square foot requirements so as to permit the construction and operation of a cellular telephone antenna facility at 2115 Durand Street.